**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DIANE STREETER,**

                                        **Plaintiff,**


                **v.**                                              **5:07-CV-858**
                                                                        **(FJS)**

**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES**                              **OF COUNSEL**

**OLINSKY & SHURTLIFF**                       **JAYA SHURTLIFF, ESQ.**
300 South State Street, 5th Floor
Syracuse, New York 13202
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**           **SANDRA M. GROSSFELD, ESQ.**
**OFFICE OF REGIONAL GENERAL**
**COUNSEL, REGION II**
26 Federal Plaza – Room 3904
New York, New York 10278
Attorneys for Defendant

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff Diane Streeter brought this action pursuant to the Social Security Act (the

"Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the

Commissioner of Social Security ("Commissioner"), denying her application for Supplemental

Security Income ("SSI").  _See_ Dkt. No. 1.

    Currently before the Court are Plaintiff's and Defendant's cross-motions for judgment on

the pleadings.

## II. BACKGROUND

Plaintiff filed an application for SSI on August 6, 2004, alleging disability since October 1, 2003, due to mild mental retardation and several physical impairments, including obesity, very severe obstructive sleep apnea with hypersomnolence and fatigue, degenerative changes in the form of osteophytes in the lumbar spine, and diabetes mellitus.  The Social Security Administration denied Plaintiff's claim on December 1, 2004.  *See* Administrative Record ("AR") at 19, 26-29.  Plaintiff filed a timely request for a hearing on December 14, 2004.  *See id.* at 30. A video teleconference hearing was held before Administrative Law Judge ("ALJ") Michael Brounoff on August 25, 2005.  *See id.* at 19-24.  Attorney Anthony DiMartino Jr. represented Plaintiff, who appeared and testified.  *See id.* at 19.  David Festa, a vocational expert ("VE") also testified at the hearing.  *See id.*

ALJ Brounoff considered the case *de novo* and issued a written decision denying Plaintiff's application on December 23, 2004.  *See* AR at 19-24.  In his decision, ALJ Brounoff stated that he had reviewed all of the evidence in the record, including the testimony at the hearing, and concluded that Plaintiff was not disabled under the Act.  *See id.* at 20.

The ALJ applied the five-step sequential evaluation process used in making disability determinations, *see id.* at 19-24; *see also* 20 C.F.R. § 416.920, and made the following findings:

> 1) Plaintiff has not worked since she filed her application for SSI.
> 2) Plaintiff's mild mental retardation is a medically determinable "severe" impairment.
> 3) Plaintiff does not have an impairment that meets or medically equals a listing in Appendix 1 to Subpart P of Part 404 of the

regulations.

4) Plaintiff's residual functional capacity ("RFC") is such that she can understand and follow simple instructions and directions, appears to be capable of performing simple and complex tasks with supervision and independently, may have difficulty with more complex tasks, instructions, or directions, is able to perform rote tasks and can work in an appropriate setting in a position for which she has been adequately trained, appears to be capable of maintaining attention and concentration for tasks, can regularly attend to a routine and maintain a schedule, appears to be capable of learning some new tasks, appears to be capable of making some appropriate decisions, appears to be able to relate to and interact appropriately with others, and appears to be capable of dealing with stress.

5) Plaintiff has past relevant work as a production assembly worker.

6) Plaintiff has the RFC to perform her past relevant work as a production assembly worker.

7) Plaintiff is not disabled under the Social Security Act.

*See* AR at 23-24.

The ALJ's decision became the Commissioner's final decision on June 22, 2007, when the Appeals Council of the Social Security Administration denied Plaintiff's request for review. *See id.* at 4.

Plaintiff commenced this action on August 23, 2007, *see* Dkt. No. 1, and filed a supporting brief on April 24, 2008, *see* Dkt. No. 13. Defendant filed a response brief on August 22, 2008, *see* Dkt. No. 21.

## III. DISCUSSION

**A.    Standard of review**

Absent legal error, a court will uphold the Commissioner's final determination if there is substantial evidence to support it. *See* 42 U.S.C. § 405(g). The Supreme Court has defined

substantial evidence to mean "'more than a mere scintilla'" of evidence and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).

The test for substantial evidence applies to "findings of basic evidentiary facts," as well as "to inferences and conclusions drawn from such facts."  *Alexandrou v. Sullivan*, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing *Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966)).  If the court can understand the rationale of the ALJ's decision from the evidence in the record, the ALJ is not required to explain why he found "particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (citation omitted); *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (quoting *Mongeur*, 722 F.2d at 1040).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles," the court cannot affirm the ALJ's decision regardless of whether substantial evidence supports that decision.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *Tellone v. Comm'r of Soc. Sec.*, No. 1:07-CV-953-DNH, 2010 WL 610336, *2 (N.D.N.Y. Feb. 16, 2010) (quotation omitted).

To be eligible for SSI, a claimant must show that she suffers from a disability within the meaning of the Act.  The Act defines "disability" as an inability to engage in substantial gainful activity ("SGA") by reason of a medically determinable physical or mental impairment that can be expected to cause death or last for twelve consecutive months.  *See* 42 U.S.C. § 1382c(a)(3)(A).  To determine if a claimant has sustained a disability within the meaning of the Act, the ALJ follows a five-step process:

1) The ALJ first determines whether the claimant is engaged in SGA.  *See* 20 C.F.R. §§ 416.920(b), 416.972.  If so, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(b).

2) If the claimant is not engaged in SGA, the ALJ determines if the claimant has a severe impairment or combination of impairments.  *See* 20 C.F.R. § 416.920(c).  If not, the claimant is not disabled.  *See id.*

3) If the claimant has a severe impairment, the ALJ determines if the impairment meets or equals an impairment found in the appendix to the regulations (the "Listings").  If so, the claimant is disabled.  *See* 20 C.F.R. § 416.920(d).

4) If the impairment does not meet the requirements of the Listings, the ALJ determines if the claimant can do her past relevant work.  *See* 20 C.F.R. § 416.920(e), (f).  If so, she is not disabled.  *See* 20 C.F.R. § 416.920(f).

5) If the claimant cannot perform her past relevant work, the ALJ determines if she can perform other work, in light of her RFC, age, education, and experience.  *See* 20 C.F.R. § 416.920(f), (g).  If so, then she is not disabled.  *See* 20 C.F.R. § 416.920(g).  A claimant is only entitled to receive disability benefits if she cannot perform any alternative gainful activity.  *See id.*

For this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step, if the analysis proceeds that far.  *See Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quotation omitted).

**B.      The ALJ's development of Plaintiff's record**

Plaintiff contends that the ALJ failed to meet his affirmative duty to develop the record and to ensure that the record was complete.  *See* Plaintiff's Memorandum of Law at 9.  Specifically, she contends that the ALJ erred by not obtaining a medical opinion from Plaintiff's treating physician, Dr. Judy Pendell-McKee, regarding Plaintiff's function-by-function physical

limitations on her ability to perform basic work activities on a regular and continuing basis when determining the severity of her impairments. *See id.* at 12. Plaintiff further asserts that the ALJ inappropriately relied on Plaintiff's testimony without taking into account the effects of her mild mental retardation. *See id.* at 10.

Finally, Plaintiff claims that the ALJ's questioning of her, which was based primarily on questions that she could answer either "yes" or "no," was inappropriate because evidence in the record established that Plaintiff showed a significant limitation in her verbal comprehension and that she had problems answering questions, which she demonstrated, in part, by bringing a friend with her to help her through the process. *See id.* Plaintiff additionally asserts that, throughout the application process, she consistently claimed that she had difficulty understanding new things and things that people told her. *See id.* at 10-11.

The ALJ must "'make reasonable efforts to obtain'" the claimant's treating physician's report. *Nelson v. Astrue*, No. 5:09-CV-00909, 2010 WL 3522304, *8 (N.D.N.Y. Aug. 12, 2010) (quoting *Devora*, 205 F. Supp. 2d at 174). However, the lack of a medical source statement will not make the record incomplete, *see* 20 C.F.R. §§ 416.913(b)(6), 404.1513(b)(6), provided that the ALJ made his determination or decision based on "sufficient" and "consistent" evidence. *See* 20 C.F.R. § 416.927(c)(1); *see also* 20 C.F.R. §§ 404.1512(e), 416.912(e); *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (holding that the ALJ is permitted to reject benefits claim without seeking additional information if there are no gaps in the record and if the ALJ is in possession of the claimant's complete medical history (citing *Perez*, 77 F.3d at 48)).

A complete medical history consists of the records of medical sources covering at least the twelve months preceding the month in which the claimant files an application for benefits.

*See* 20 C.F.R. § 416.912(d).  In addition, the ALJ must consider all of the claimant's symptoms, such as pain, as long as the claimant's symptoms "can reasonably be accepted as consistent with the objective medical evidence, and other evidence."  20 C.F.R. § 416.929(a).

Although Plaintiff correctly notes that the record lacks a medical source statement from her treating physician, the ALJ made reasonable efforts to obtain such a record.  The ALJ sent a letter to Plaintiff's counsel prior to the hearing, advising him about how to obtain Plaintiff's medical records, including medical opinions.  *See* AR at 121-22.  In that letter, the ALJ asked counsel to provide him, along with other medical records, with "a fully completed Medical Assessment from the physician most familiar with the claimant's impairments"; to make a second request if counsel did not receive a medical sources statement; and, if Plaintiff's counsel did not receive the requested information within thirty days of the initial request, to send the ALJ a copy of his letter to Plaintiff's treating source and to contact the ALJ's office immediately so that the ALJ could request the information.  *See id.*  In a letter dated May 13, 2005, Plaintiff's counsel sent a request to Plaintiff's treating physician, asking for Plaintiff's complete medical records as well as an opinion about whether Plaintiff was disabled.  *See id.* at 124.

In addition to his letter to Plaintiff's counsel prior to the hearing, the ALJ specifically asked Plaintiff's counsel, during the hearing, if the medical records were complete, to which Plaintiff's counsel responded affirmatively.  *See* AR at 250-51.  Furthermore, the record includes treating source medical records for the eighteen months preceding Plaintiff's filing,[1] exceeding the regulations' requirements for a complete medical history.  *See* 20 C.F.R. § 416.912(d).  Thus,

---

[1] Plaintiff filed her application on August 6, 2004, and the record includes information from January 13, 2003, to July 15, 2005, including the records from Plaintiff's treating physician. *See* AR at 140-240.

the Court finds that the ALJ met his duty to develop the record completely and to ensure that he had a complete medical record.

In addition, the Court rejects Plaintiff's assertion that the ALJ relied solely on her testimony in making his disability determination.  *See* Plaintiff's Memorandum of Law at 10.  In fact, the ALJ explicitly stated that he found Plaintiff's testimony to be "consistent with the opinion of an examining physician (Exhibit 3F) and the opinion of a State Agency disability analyst (Exhibit 4F)," *see* AR at 21, and that he had reviewed all of the evidence in the record in reaching his conclusion, *see* AR at 20.

Finally, having reviewed the entire administrative record, including the hearing transcript, *see* AR at 246-85, the Court concludes that there is nothing in the record to support Plaintiff's assertion that the ALJ's questioning of her at the hearing was too complex for her to understand. In addition, there is substantial medical and other evidence in the record consistent with Plaintiff's testimony regarding her symptoms, treatment and adaptive functioning to support the ALJ's finding that Plaintiff's physical impairments were being effectively treated and were not causing her any significant pain.  *See* 20 C.F.R. § 416.929(a).

**C.    The ALJ's findings regarding Plaintiff's impairments**

At step two of the five-step evaluation process, the ALJ found that Plaintiff's diagnosis of mild mental retardation constituted a severe mental impairment.  However, he also found that Plaintiff did not have a severe physical impairment because her physical impairments were generally under control with treatment and did not impose any limitations on her functioning. *See* AR at 20-21, 23.

At step three of the five-step process, the ALJ found that Plaintiff's IQ scores were within the range of Listing 12.05(C), *see id.* at 21-22. However, he concluded that her "daily activities . . . and history of competitive employment reflect[ed] a high level of adaptive functioning" that was inconsistent with the listing level. *See id.* at 21. Moreover, the ALJ noted that any of Plaintiff's limitations in reading, writing, and mathematics were merely an aspect of her mild mental retardation and were not diagnosed as separate learning disorder impairments. *See id.* at 22.

Additionally, the ALJ made the following finding:

> [Plaintiff's] residual functional capacity is such that she can understand and follow simple instructions and directions, appears to be capable of performing simple and complex tasks with supervision and independently, may have difficulty with more complex tasks, instructions, or directions, is able to perform rote tasks and can work in an appropriate setting in a position for which she has been adequately trained, appears to be capable of maintaining attention and concentration for tasks, can regularly attend to a routine and maintain a schedule, appears to be capable of learning some new tasks, appears to be capable of making some appropriate decisions, appears to be able to relate to and interact appropriately with others, and appears to be capable of dealing with stress.

*See id.* at 23.

The ALJ based his findings on Plaintiff's testimony as well as "the opinion of an examining physician (Exhibit 3F) and the opinion of a State Agency disability analyst (Exhibit 4F)." *See* AR at 21.

Plaintiff claims that the ALJ erred in finding that she did not have an additional severe mental or physical impairment and that the ALJ erred by substituting his lay opinion regarding her level of adaptive functioning for the objective evidence, improperly relying on her self-

reported daily activities.  *See* Plaintiff's Memorandum of Law at 15.  Plaintiff further contends that it is unclear in what manner her daily activities represent a level of adaptive functioning greater than an IQ score of "57"[2] or supplant the objective testing.  *See id.*  Finally, Plaintiff asserts that her obesity, sleep apnea, knee pain, degenerative changes in the lumbar spine, and diabetes impose additional and significant work-related limitations.  *See id.*

The Listings were created to "describe[] for each of the major body systems impairments that . . . [are] severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925(a).  Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05.  Listing 12.05(C) requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]"[3]  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05(C).  This impairment must be "severe," *see* 20 C.F.R. § 404.1520(c), and "must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509.  Moreover, the "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.

---

[2] Plaintiff's lowest IQ score was 62, not 57.  However, Plaintiff claims that the ALJ should have applied a five-point standard of error when determining her actual IQ score and, thereby, should have determined that her IQ score was really 57.

[3] In assessing the IQ score component of Listing 12.05, the ALJ should use the lowest of the three Wechsler IQ test results (Verbal, Performance, and Full Scale IQs).  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(6)(c).

-10-

For an impairment to be severe, it must cause a significant limitation on the claimant's "physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.921(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b).  A claimant's ability to do her past work and other work may be reduced by a claimant's inability to perform certain physical demands "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching) . . . ."  20 C.F.R. § 404.1545(b).

Adaptive functioning can be determined by looking at the claimant's "'effectiveness in areas such as social skills, communication, and daily living skills.'"  *Edwards v. Astrue*, No. 5:07-CV-898, 2010 WL 3701776, *3 (N.D.N.Y. Sept. 16, 2010) (quotation omitted); *see also* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 42 (4th ed. rev. 2000) ("DSM-IV") (defining "adaptive functioning" as "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting"); *Edwards*, 2010 WL 3701776, at *3 (finding that "[a] plaintiff who can dress, bathe, manage money, communicate effectively, do simple math and take care of personal needs does not suffer from adaptive deficits" (citing *Harris v. Comm'r of Soc. Sec.*, 330 Fed. App'x 813, 815 (11th Cir. 2009)).  Additionally, in making his factual findings about the claimant's adaptive functioning, the ALJ may consider the claimant's work and social history.  *See id.*

In this case, Plaintiff's Wechsler IQ test, which Dr. Shapiro administered during a consultative intelligence evaluation on June 10, 2005, resulted in a Verbal Scale IQ of 62, a

Performance Scale IQ of 73, and a Full Scale IQ of 64.  *See* AR at 224.  Dr. Shapiro considered

the results "to be valid and a reliable estimate of current functioning" and concluded that,

"[o]verall, [Plaintiff] is functioning in the mild range of mental retardation."  *See id.*

       In addition to her mental impairment, Plaintiff has been diagnosed as obese or "morbidly

obese."  *See id.* at 173, 178, 203, 209.  However, Plaintiff testified that her blood pressure, blood

sugar, and weight gain did not cause her problems throughout an average day and that she was

receiving effective treatment for both her diabetes and high blood pressure.  *See id.* at 265-67.

This testimony is consistent with the record of her visits to consultative physician, Dr. Shayevitz,

M.D., *see id.* at 175-78, a State Agency disability analyst, who conducted a physical RFC

assessment of Plaintiff, *see id.* at 179-84, and the medical records from Plaintiff's treating

physician.

       Moreover, although Plaintiff was diagnosed with obstructive sleep apnea with

hypersomnolence on July 17, 2003, *see id.* at 173, 202-03, on September 15, 2003, she was

successfully treated for this condition through the use of a Continuous Positive Airway Pressure

("CPAP") mask, *see id.* at 203 ("Nasal [CPAP] normalized breathing and improved sleep

quality").  Plaintiff testified that the regular use of the CPAP mask allowed her to sleep every

night and stay awake throughout the day.  *See id.* at 264.  During three separate visits to Otselic

Valley Family Health, as well as during a visit to Industrial Medicine Associates, P.C. for an

intelligence evaluation, Plaintiff reported that she felt well, had been sleeping well, and/or that

her energy level was good or "OK."  *See id.* at 205-07, 222.

       During a consultative examination with Dr. Shayevitz on September 8, 2004, Plaintiff

claimed that she could not squat and had stiff knees at night.  *See id.* at 175-76.  Dr. Shayevitz

found that Plaintiff had normal gait and station; her stance was normal; she did not need assistance dressing herself or getting on and off the examination table; she could rise from a chair without difficulty; and she had no limitations in sitting, standing, walking or stair climbing in general.  *See id.* at 176, 178.  Dr. Shayevitz also found that Plaintiff had a full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally; her strength was 5/5 in both her upper and lower extremities; her joints were stable and non-tender with no evidence of subluxations, contractures, aklyosis, or thickening, nor was there redness, heat, swelling, or effusion.  *See id.*  Moreover, Dr. Shayevitz found Plaintiff's hand and finger dexterity to be intact, with bilateral grip strength of 5/5; that she had no noted motor or sensory deficits; and that her cervical, thoracic, and lumbar spine were normal, with full movement, extension, and flexion. *See id.* at 177.  Dr. Shayevitz concluded that Plaintiff had problems understanding instructions, treated hypertension, non-insulin dependent diabetes mellitus, occasional knee pain, treated sleep apnea, and obesity.  *See id.* at 178.  Finally, Dr. Shayevitz opined that Plaintiff could rapidly and repetitively handle small objects while seated.  *See id.* at 178.

During a physical RFC assessment on November 3, 2004, a State Agency, Disability Determination Services physician found that Plaintiff had "no problem with sitting, standing, walking or stair climbing;" that she could "handle small objects rapidly and repetitively while seated;" and that, overall, she had "[n]o physical limitations."  *See id.* at 184.

Plaintiff sought treatment for ankle swelling at Otselic Valley Family Health on January 6, 2004.  *See* AR at 145-46.  She returned to Otselic Valley Family Health on February 2, 2004, and reported that her ankle was no longer swelling and that she was feeling much better.  *See id.* at 147.

At the hearing before the ALJ, Plaintiff testified that she was able to clean, cook, wash dishes, do laundry, sweep, mop, and vacuum, shop, and handle money, including a savings account.  *See id.* at 267-69, 275.  She also testified that she could sit, stand, walk, lift, bend, and climb stairs, show up for work on time, socialize and get along with people, work independently once instructed, and had no problem concentrating and completing tasks that she started.  *See id.* at 269-73.  Plaintiff's testimony is generally consistent with Dr. Shapiro's findings and observations, *see* AR at 225-26; Dr. Shayevitz' findings and observations, *see id.* at 175-76; and with her other medical records.

Based on all of this evidence, it is clear that there is substantial evidence in the record to support both the ALJ's finding that Plaintiff had neither a severe physical impairment nor any additional severe mental impairment, as evidenced by her activities and relevant work experience, all of which demonstrated a high level of adaptive functioning.  Therefore, the Court concludes that the ALJ did not err when he found that Plaintiff's additional impairments were not severe within the meaning of Listing 12.05(C).

### D.    Requirements of Listing 12.05(B)

The ALJ rejected Plaintiff's argument that he should apply a five-point margin of error to her IQ scores, noting that such an argument "could just as easily [have made] the claimant's IQ scores five points higher," *see* AR at 21, and would have resulted in less than "a preponderance – the greater weight – of the evidence that her true IQ was *more likely than not* to be 59 or less."  *See id.* at 22.  The ALJ reiterated that Plaintiff's high level of adaptive functioning was already inconsistent with the less stringent requirement of Listing 12.05(C).  *See id.*  Finally, the ALJ

rejected the use of Plaintiff's IQ scores from 1982, including a verbal score of 51, finding that,

particularly when "considering the claimant's high level of adaptive functioning," "[t]here is no

basis in the evidence to presume the claimant's IQ scores have been static for a period of over 20

years."  *See id.*

Plaintiff contends that the ALJ applied an inappropriate legal standard in determining

whether her IQ scores satisfied the listing-level requirements.  *See* Plaintiff's Memorandum of

Law at 15.  Plaintiff claims that there is a five-point margin of error on the Wechsler IQ test,

which resulted in one of Plaintiff's most recent IQ scores, a Verbal Scale score of 62, meeting the

requirements for Listing 12.05(B).  *See id.* at 13-15.  Moreover, Plaintiff asserts that her previous

IQ tests each revealed at least one score below 60 and that these test scores satisfied the listing-

level requirements.  *See id.*

To meet the required level of severity, Listing 12.05(B) requires "[a] valid verbal,

performance, or full scale IQ of 59 or less."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05, 12.05(B).

"The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100

and a standard deviation of 15; e.g. the Wechsler series."  20 C.F.R. Pt. 404, Subpt. P, App. 1,

12.00(D)(6)(c).  The Wechsler Intelligence Scales are the standard instrument for assessing

intellectual functioning.  *See Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002).  However, IQ

scores using the Wechsler Intelligence Scales have a measurement error of approximately five

points.  *See* DSM-IV at 41, 48.

Although

> [t]he results of standardized intelligence tests may provide data that
> help verify the presence of mental retardation . . ., as well as the
> extent of any compromise in cognitive functioning . . . [,] since the

> results of intelligence tests are only one part of the overall
> assessment, the narrative report that accompanies the test results
> should comment on whether the IQ scores are considered valid and
> consistent with the developmental history and the degree of
> functional limitation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(6)(a).

Additionally, when the test scores for a person between the ages of seven and sixteen are forty or

greater, the test scores should be viewed as valid for two years. *See* 20 C.F.R. Pt. 404, Subpt. P,

App. 1, 112.00(D)(10). Although test scores for a person sixteen or older "should be viewed as a

valid indication of the child's current status," this only applies when the scores are still

compatible with a claimant's current behavior. *Id.*

The Second Circuit has not addressed the question of whether the five-point margin of

error on the Wechsler Intelligence Scales either requires or permits the court to consider the

margin of error when determining whether an applicant for SSI meets the listing-level definition

under 12.05(B) or 12.05(C). Nor has any district court within this Circuit addressed this specific

issue.[4] However, although no circuit courts have addressed this issue with regard to Listing

---

[4] Plaintiff cites *Johnson v. Barnhart*, 312 F. Supp. 2d 415 (W.D.N.Y. 2003), to support
her claim that the Court should apply a five-point standard margin of error to her scores. *See*
Plaintiff's Memorandum of Law at 14. In *Johnson*, the plaintiff argued that his IQ score of 72,
measured at age fifteen, together with other physical and mental impairments, met the
requirements of Listing 12.05(C). *See id.* at 425. To support his contention, the plaintiff relied
on the Social Security Administration's Program Operations Manual System ("POMS"). POMS
§ DI 24515.056(D)(1)(c) provides that

> Listing 12.05C is based on a combination of an IQ score with an
> additional and significant mental or physical impairment. The
> criteria for this paragraph are such that a medical equivalence
> determination would very rarely be required. However, slightly
> higher IQ's (e.g., 70-75) in the presence of other physical or mental
> disorders that impose additional and significant work-related

(continued...)

-16-

12.05(B), every circuit court that has addressed the issue with regard to Listing 12.05(C) has held

that the courts cannot apply the standard margin of error to the range of scores in Listing

12.05(C).  *See Burns v. Barnhart*, 312 F.3d 113, 125 (3d Cir. 2002) (holding that reading an error

range into the regulations for purposes of determining the IQ score "would violate the plain

language of the regulation")*; Dover v. Apfel*, No. 99-5035, 2000 WL 135170, *2 (10th Cir. Feb.

7, 2000) (unpublished) (finding that incorporation of margin of error would "'effectively

expand'"/"'alter'" the IQ range of Listing 12.05(C), "'in contradiction of the federal regulations

interpreting the Act'" (quotation omitted)); *Newland v. Apfel*, No. 97-4339, 1999 WL 435153, *6

(6th Cir. June 17, 1999) (unpublished) (rejecting use of margin of error, reasoning that

regulations do not allow functional equivalency when test scores are specified); *Anderson v.

Sullivan*, 925 F.2d 220, 223 (7th Cir. 1991) (rejecting argument that standard error range should

be factored into IQ score and finding that "the Secretary was entitled to rely on the plain language

of the regulation"); *Bennet v. Bowen*, No. 88-3166, 1989 WL 100665, *4 (4th Cir. Aug. 28,

1989) (unpublished) (rejecting "the proposition that 'close counts in horseshoes' as well as the

---

[4](...continued)
>           limitation of function may support an equivalence determination.
>           It should be noted that generally the higher the IQ, the less likely
>           medical equivalence in combination with another physical or
>           mental impairment(s) can be found.

POMS § DI 24515.056(D)(1)(c).

    *Johnson* is not dispositive of this case.  First of all, it addressed Listing 12.05(C) and not
Listing 12.05(B).  Second, the relevant POMS section specifically states that "a medical
equivalence determination would very rarely be required."  POMS § DI 24515.056(D)(1)(c).
Plaintiff has not pointed to anything in this case that would render it one of those rare instances
in which a medical equivalence would be required.  Finally, an equivalency determination is only
indicated "in the presence of other physical or mental disorders that impose additional and
significant work-related limitation of function," *id.*, none of which exist in this case.

-17-

Listings").[5]

In declining to apply the standard five-point margin of error to IQ scores, each of these courts reasoned that the Commissioner was aware of the five-point margin of error when he promulgated the score requirement ranges for each of the applicable Listings; and, thus, there was no reason to deviate from the plain language of the regulations. The Court finds this reasoning persuasive and concludes that such reasoning is equally applicable to Listing 12.05(B). Thus, the Court rejects Plaintiff's argument that the ALJ erred when he did not apply the five-point margin of error when determining that Plaintiff's Verbal Score of 62 failed to meet the requirements of Listing 12.05(B).

Moreover, the Court finds that the ALJ did not err when he rejected Plaintiff's 1982 IQ scores. First of all, absent from the record of Plaintiff's June 1, 1982 IQ test scores is any statement that confirms the validity or accuracy of those scores; and, in fact, the supervising school psychologist did not sign the record of this "triennial evaluation." *See* AR at 199-201. In any event, Plaintiff's IQ scores from the June 1982 evaluation are no longer valid because she took the test four months before her sixteenth birthday, and her lowest score was above 40 (a Verbal score of 51); thus, these scores were only valid for two years. Even if the scores had met the more lenient restrictions of a claimant at the age of sixteen or older, given the ALJ's finding

---

[5] Although neither the Ninth nor Eleventh Circuit has addressed the issue, at least one district court in each of those circuits has refused to apply the standard margin of error to IQ scores. *See Garret v. Astrue*, No. EDCV 07-549-MAN, 2008 WL 4350374, *5 n.6 (C.D. Cal. Sept. 19, 2008) (finding that the use of a margin of error score range would cause an "illogical result" "for claimants with IQ scores between 65 and 70 [who] would never meet Listing 12.05C, because given the margin of error, their actual IQ scores could exceed 70" and that such use would be "directly contrary to the specific language of the Listing"); *Guerrero v. Astrue*, No. 8:09-CV-1836-T-TGW, 2010 WL 3360603, *4 (M.D. Fla. Aug. 25, 2010) (citing the Third and Seventh Circuits in rejecting the margin of error argument).

that Plaintiff had demonstrated a high level of adaptive functioning and history of competitive employment, a finding that the Court concludes is supported by substantial evidence in the record, Plaintiff's 1982 IQ scores clearly are not indicative of her current status.[6]


**E.     Past relevant work**

At step four of the five-step evaluation process, the ALJ found that Plaintiff was capable of performing her past relevant work as a production assembly worker and that she maintained the RFC to perform this work.  *See* AR at 22-23.  To assist him in making this determination, the ALJ obtained the testimony of VE David Festa.  *See id.* at 23.  The ALJ asked Mr. Festa to assume the existence of a person with the same age, education and work history as Plaintiff and the same mental limitations as those that Dr. Shapiro diagnosed during a consultative intelligence evaluation.  *See id.*  The ALJ then asked Mr. Festa if that hypothetical person could perform any of Plaintiff's past work.  *See id.*  Mr. Festa responded that such a claimant could perform Plaintiff's past work as a production assembly worker.  *See id.*  The ALJ then concluded that Plaintiff's job as a production assembly worker constituted past relevant work and that Plaintiff maintained the RFC to perform that work.  Therefore, the ALJ found that Plaintiff was not disabled under the Act.  *See id.*

---

[6] The Court notes that district courts in this Circuit have found that "an ALJ may reject an IQ score as invalid when it is inconsistent with the record."  *Paulino v. Astrue*, No. 08 Civ. 02813, 2010 WL 3001752, *22 (S.D.N.Y. July 30, 2010) (citing *Baszto v. Astrue*, No. 08-CV-958, — F. Supp. 2d —, 2010 WL 1235672 at *5 (N.D.N.Y. Mar. 31, 2010) ; *Miller v. Astrue*, No. 07-CV-1093, 2009 WL 2568571 at *7 n.7 (N.D.N.Y. Aug. 19, 2009); *Lebron v. Barnhart*, 2008 WL 2696142 at *8 (S.D.N.Y. July 8, 2008); *Vazquez v. Barnhart*, 04 Civ. 7409, 2005 WL 2429488 at *8 (S.D.N.Y. Sept. 30, 2005) (Lynch, D.J.); *Vasquez-Ortiz v. Apfel*, 48 F. Supp. 2d 250, 257 (W.D.N.Y. 1999)) (footnote and other citations omitted).

Plaintiff claims that the ALJ failed to apply the appropriate legal standard in determining that Plaintiff was capable of performing her past relevant work. *See* Plaintiff's Memorandum of Law at 16. Plaintiff asserts that the ALJ failed to make a required finding of fact as to the specific physical and mental demands of Plaintiff's past relevant work. *See id.* at 17. Finally, Plaintiff claims that, due to the ALJ's errors in evaluating the medical evidence and developing the record, his RFC findings upon which the VE relied were not a full and accurate description of Plaintiff's limitations. *See id.* at 16-18.

At step four of the five-step analysis, the burden is on the claimant to prove that her limitations render her unable to perform her past relevant work. *See Monette v. Astrue*, 269 Fed. Appx. 109, 111 (2d Cir. 2008) (quotation omitted). This is because the ability to perform past work "may be indicative of the capacity to engage in SGA when that work experience constituted SGA and has current relevance considering duration and recency." SSR 82-62, 1982 WL 31386, *2 (1982).[7] To determine if a plaintiff is capable of performing past work, the ALJ must compare the plaintiff's current RFC to the demands of her past work. *See id.* at *3; *see also* 20 C.F.R. § 416.920(f); *State of New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990). To establish disability at step four, a plaintiff must show that her RFC is incompatible with the performance of her past relevant work either as she had actually performed it or as others generally perform it. *See Shatraw v. Astrue*, No. 7:04-CV-0510, 2008 WL 4517811, *17

---

[7] The Social Security Administration indicates that a claimant's past work is normally relevant when the claimant performed that work within the last fifteen years. *See* SSR 82-62, at *2. In this case, Plaintiff performed past work as a production assembly worker from July 1998 to September 2001 at a level indicative of SGA. *See* AR at 23. Since Plaintiff filed her claim in 2004, her work as a production assembly worker is well within the fifteen-year range and, thus, is relevant.

(N.D.N.Y. Sept. 30, 2008) (citation omitted).  A person's RFC is the most "an individual can do

despite his or her limitations or restrictions[.]"  SSR 96-8p, 1996 WL 374184, *1 (July 2, 1996);

20 C.F.R. § 404.1545(a).

Finally, at step four, the ALJ may use a VE or other specialist to offer relevant evidence

about the physical and mental demands of the claimant's past relevant work and to provide

"expert opinion testimony in response to a hypothetical question about whether a person with the

physical and mental limitations imposed by the claimant's medical impairment(s) can meet the

demands of the claimant's previous work[.]"  20 C.F.R. § 404.1560(b)(2).  To uphold an ALJ's

finding that relies on the opinion of a VE, the court must find "substantial record evidence to

support the assumption upon which the [VE] based his opinion."  *Dumas v. Schweiker*, 712 F.2d

1545, 1554 (2d Cir. 1983) (footnote omitted).

When the ALJ uses a VE, "the ALJ must present a hypothetical that incorporates all of a

claimant's impairments."  *Salmini v. Astrue*, No. 3:06-CV-458, 2009 WL 1794741, *11

(N.D.N.Y. June 23, 2009) (citation omitted).  "If the ALJ fails to pose hypothetical questions

which do 'not include all of a claimant's impairments, limitations and restrictions, or [are]

otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to

support a conclusion of no disability.'"  *Id.* (quotation omitted).

In this case, the Court finds that the ALJ based his RFC determination that Plaintiff had

the capacity to perform her past relevant work on all of the evidence in the record, including

medical evidence and Plaintiff's own testimony.  Indeed, contrary to Plaintiff's assertion, the

record indicates that the ALJ considered whether Plaintiff could do her past relevant jobs as she

actually performed them.  Moreover, in finding that Plaintiff was capable of performing her past

-21-

relevant jobs, the ALJ noted her testimony "that she could work, and could return to the type of jobs she has held in the past." *See* AR at 22-23.  Plaintiff also testified that she was both willing and capable of returning to her previous assembly job "as a bagger of bobbins." *See id.* at 262. Finally, the Court finds that the ALJ's hypothetical question to the VE included all of Plaintiff's impairments, limitations, and restrictions and that, therefore, the VE's response constituted substantial evidence to support the ALJ's conclusion of no disability

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings is **AFFIRMED** and Plaintiff's complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: April 26, 2011
        Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge